IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

180s, Inc. and 180s, LLC                    *
                                            *
                                            *
         v.                                 *          Civil No. JFM-08-177
                                            *
Gordini U.S.A., Inc.                        *
                                       ******

OPINION

         180s, Inc. and 180s, LLC (collectively "180s") sued Gordini U.S.A., Inc. for trade dress

and patent infringement stemming from Gordini's sale of certain ear warmers. This action is

based on three of 180s' patents: U.S. Patent No. 6,978,483 ("'483 patent"), U.S. Patent No.

7,212,645 ("'645 patent"), and U.S. Design Patent No. 545,001 ("'001 design patent"). On

March 12, 2010, I heard oral arguments pertaining to claim construction. This Opinion outlines

my decisions on these issues.[1]

I.

         A patent includes both claim(s) and a specification. The specification "contain[s] a

written description of the invention, and of the manner and process of making and using it, in

such full, clear, concise, and exact terms as to enable any person skilled in the art to which it

pertains . . . to make and use the same . . . ." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311–12

(Fed. Cir. 2005) (citing the Patent Act, 35 U.S.C. § 112). The specification "conclude[s] with one

or more claims particularly pointing out and distinctly claiming the subject matter which the

applicant regards as his invention." *Id.* at 1311–12 (citing § 112). "[A] bedrock principle of

_____

[1] For the '483 patent, I will construe the following terms: (1) "ear warmer frame," (2) "member" terms (first, second, and third frame members), (3) "passageway," (4) "projection," and (5) "plurality of projections." For the '645 patent, I will construe the following terms: (1) "[first/second] membrane," (2) "receptacle," (3) "opening," (4) "communicates with," (5) "disposed proximate," and (6) "second end including a connector."

patent law" is that these patent claims "define the invention to which the patentee is entitled the right to exclude." *Id.* at 1312 (internal citations and quotations omitted).

As a first step in an infringement analysis, prior to comparing the accused device to the patent claims, a court must interpret the claims.[2] *See Young Dental Mfg. Co. v. Q3 Spec. Prods.*, 112 F.3d 1137, 1141 (Fed. Cir. 1997); *see also Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1320 (Fed. Cir. 2003). At this claim construction stage, claims are interpreted and defined through the eyes of a person of ordinary skill in the art and are accordingly generally given "the meaning that the term[s] would have to a person of ordinary skill in the art[.]"[3] *Phillips*, 415 F.3d at 1313 (internal citations and quotations omitted). Sometimes, a term's meaning to a person of skill in the art is synonymous with the widely accepted definition of that term, while other times ascertaining that meaning will require a more sophisticated inquiry. *See id.* at 1314.

In determining the meaning to a person of skill in the art, a district court may properly consider both intrinsic and extrinsic evidence. *Id.* at 1313–18; *Vitronics Corp.*, 90 F.3d at 1582–83. Intrinsic evidence includes the claim language, other claims in the patent, the specification, and the prosecution history.[4] *Phillips*, 415 F.3d at 1313–17; *Vitronics*, 90 F.3d at 1582. Although the court should start with the claim language, the claim specification is "always highly relevant" and often dispositive. *Phillips*, 415 F.3d at 1315 (internal citation and quotation omitted); *see also Vitronics*, 90 F.3d at 1582 ("The specification acts as a dictionary when it expressly defines terms used in the claims or when it defines terms by implication."). Despite the importance of a specification, "a court should not read a limitation from the specification into the claim." *Tate Access Floors v. Interface Architectural Res., Inc.*, 185 F. Supp. 2d 588, 595 (D. Md. 2002)

---

[2] Claim construction is a matter of law. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed. Cir. 1996).

[3] Design patent claims are construed somewhat differently. *See infra* Section II.C.

[4] Prosecution history is the "record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics*, 90 F.3d at 1582.

(Motz, J.); *accord Anchor Wall Sys. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1306–07 (Fed. Cir. 2003). A "fine line" exists "between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Anchor Wall Sys.*, 340 F.3d at 1307 (internal citation and marks omitted).

The extrinsic evidence that may be considered includes dictionaries, learned treatises, prior art, inventor testimony, and expert testimony.[5] *Phillips*, 415 F.3d at 1317–18. Extrinsic evidence can inform the court about the field and technical aspects of the invention, and help the court determine how a person of ordinary skill in that field would understand the claim. *See id.* at 1317–19. That said, while extrinsic evidence may be helpful, "it is less significant than the intrinsic record." *Id.* at 1317. A party may not use any extrinsic evidence "to contradict claim meaning that is unambiguous in light of the intrinsic evidence." *Id.* at 1324.

## II.

As a preliminary matter, 180s correctly points out that I have made clear I will only construe ten to twelve terms. Although Gordini's Opening Claim Construction Brief purports to limit itself to that number, the claim constructions that it provided to 180s on February 2, 2010 construed dozens of terms.[6] (*See generally* Opening Claim Constr. Brief of Pls. 180s, Inc. and 180s, LLC ("Pls.' Mem."), Ex. G.) In light of my previous instruction, and the practical difficulty

---

[5] Generally, claims are construed without reference to the accused device. *See, e.g., Sri Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1118 (Fed. Cir. 1985) ("It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement." (emphasis in original)). However, "giving meaning to claim terms always takes place in the context of a specific accused infringing device or process." *Wilson Sporting Goods Co. v. Hillerich & Bradsby Co.*, 442 F.3d 1322, 1326–27 (Fed. Cir. 2006). Accordingly, "if the litigants cannot themselves inform a trial court of the specific issues presented by the infringement inquiry—that is, issues of the breadth of the claim construction analysis and the most useful terms to facilitate that defining process—then a trial court may refer to the accused product . . . for that context . . . ." *Id.* at 1331.

[6] Gordini argues that both the '483 patent claims and '645 patent claims should be construed narrowly because they are "narrow improvement[s] in a crowded field of prior art." Although this argument makes some logical sense, Gordini fails to cite any Federal Circuit case the expressly establishes such a rule. The Federal Circuit case Gordini does cite—*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1457–58 (Fed. Cir. 1991)—is pre-*Markman* and only holds that a claim that is a "mechanical combination in a crowded field" is entitled to a "narrow scope of equivalents."

of examining every term for which Gordini has at some point provided a construction, I will only consider constructions and legal arguments Gordini expressly included—and did not later abandon—in its Opening Claim Construction Brief, Response, and Claim Construction Statements. All claim terms not construed by this Court will be given their plain meaning by the fact finder.[7] *Cf. O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008) ("A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute."); *Sulzer Textile A.G. v. Picanol N.V.*, 358 F.3d 1356, 1366–67 (Fed. Cir. 2004) (citing *U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1567 (Fed. Cir. 1997)) (distinguishing *U.S. Surgical*, where the Federal Circuit held claim construction was unnecessary, by noting that in *U.S. Surgical* the claim terms "were understood throughout the case as having their plain meaning" and that "*U.S. Surgical* held that when the parties do not dispute that the words of the claims simply mean what they say, the district court is not required to add an additional layer of complexity by 'constructing' the words").

A.

180s alleges patent and trade dress infringement based on the '483 patent. This patent describes the "apparatus and method for making an ear warmer and an ear warmer frame" without "necessarily involv[ing] extraneous components (such as bolts or screws) or

---

[7] Gordini continues to argue that I should bar 180s from advancing its "ordinary meaning" approach for the terms for which 180s did not offer constructions. In other words, "constructions for the terms not discussed [within Gordini's Opening Claim Construction Memo] are undisputed for all purposes relevant here and should be adopted by the Court." (Def. Gordini's Initial Markman Claim Constr. Brief ("Def.'s Mem.") at 31–32.) Because 180s appropriately limited the number of its constructions in an effort to comply with my instruction limiting the number of terms to be construed, Gordini's argument that 180s waived their right to object to Gordini's other term constructions is without merit.

environmentally unfriendly glues or adhesives." (*See* Pls.' Mem. at 6; *see also id.*, Ex. A at col.

1, ll. 35–45.) The claims at issue are independent claim 3 and dependent claim 4:

> **3.** A method of assembling an ear warmer frame, the ear warmer frame
> including a first frame member including a passageway and a projection, a
> second frame member including a plurality of projections, and a third frame
> member including a passageway and projection, said method comprising:
>> inserting the second frame member into the first frame member
>> passageway;
>> engaging the projection on the first frame member with the plurality of
>> projections on the second frame member; and
>> coupling the second frame member and the third frame member.
>
> **4.** The method of claim **3**, wherein said coupling the second frame member and
> the third frame member comprises: inserting the second frame member into the
> third frame member passageway; and engaging the projection on the third frame
> member with the plurality of projections on the second frame member.

(*Id.*, Ex. A at col. 11, ll. 25–43.) Some of the embodiments discussed in the specification consist

of an ear warmer frame made of one unitary piece. Claims 3 and 4, however, involve a frame

constructed from multiple parts. (*See id.*, Ex. A at Figs. 16 & 17.)

i.   <u>"Ear Warmer Frame"</u>

**As both 180s and Gordini propose, I construe "ear warmer frame" as "a structure**

**that supports a device worn on or over the ears whose primary function is to keep ears**

**warm."** (*See id.* at 9; Def. Gordini's Response to 180s [sic] Initial Markman Claim Constr. Brief

("Def.'s Response") at 3.)

ii.   <u>"Member" / "first frame member" / "second frame member" / "third</u>
<u>frame member"</u>

The chart below describes the parties' competing definitions of the "member" terms.[8]

---

[8] For the purpose of my limiting term constructions to ten to twelve, I consider these "member" terms collectively as
a single term construction.

| | 180s' Construction | Gordini's Construction |
|---|---|---|
| "member" | No construction term provided. The term "member" never appears in the claims alone . . . . Accordingly, no separate construction of the term "member" is necessary or appropriate | a unitary component having a length that may be coupled to one or more other unitary components; when the unitary components are coupled, they manifest motion relative to one another |
| "first frame member" | a part of an ear warmer frame | a first "member" (construed above) |
| "second frame member" | a part of an ear warmer frame, separate and distinct from the first frame member | a second "member" (construed above) |
| "third frame member" | a part of an ear warmer frame, separate and distinct from the first and second frame members | a third "member" (construed above) |

**First, I construe "member" as a "part."** In light of the claim language, specification, and illustrative figures in the patent, "member" is synonymous with "part." (*See* Pls.' Mem., Ex. A at col. 7, ll. 39–52, Figs. 16 & 17.) Gordini's proposed construction of "member" is both too narrow and unnecessarily confusing. Nothing in the claim language necessitates that "members," when coupled, "manifest motion relative to one another." Although the specification indicates that some members in some embodiments "move relative to each other to adjust the overall length of the frame[,]" (*see* Pls.' Mem., Ex. A at col. 7, ll. 40–45), the widely accepted understanding of "member" does not, explicitly or implicitly, implicate "movement relative to one another."

**Additionally, I construe "[first/second/third] frame member" as follows:**

- **"First frame member": a part of an ear warmer frame, separate and distinct from the second and third frame members**
- **"Second frame member": a part of an ear warmer frame, separate and distinct from the first and third frame members**
- **"Third frame member": a part of an ear warmer frame, separate and distinct from the first and second frame members**

This construction closely, but not identically, parallels 180s proposed construction. I added the extra "separate and distinct . . ." language to the "first frame member" and the "second

frame member" to make clear that each "member" is separate and distinct from each other "member." Any redundancy this language creates is outweighed by the clarity it establishes.

### iii.    "Passageway"

180s construes "passageway" as "a long, narrow way, typically having walls on either side, that allows access." (180s seemed to abandon its request for "long" and "narrow" at oral arguments.) Gordini defines "passageway" as "a loop, like a belt loop, having a perimeter fully enclosing an opening and is topologically genus one."

**I construe "passageway" as a "way, typically having barriers at least on either side, that allows access."** This parallels 180s' proposed construction, with two exceptions. First, "at least" is added to clarify that a "passageway" may have barriers on more than just two sides. For example, the "passageway" in Figure 17 has, in addition to barriers on two walls, a barrier on what looks like, depending on how the ear warmer is positioned, the roof. Figure 17, therefore, has barriers on three sides of the "passageway." Second, "narrow" and "long" are omitted because the passageways referenced in the specification are neither "long" nor "narrow." (*See, e.g.*, *id.*, Ex. A at col. 7, ll. 57–60.) Nor am I convinced, despite some dictionary evidence to the contrary, that "long" and "narrow" are a part of the ordinary meaning of "passageway." Regardless, the meaning supported by the specification—that a "passageway" need not be "long" or "narrow" (although it may be)—trumps any extrinsic dictionary definition. (*See* Def.'s Mem. at 7–8 (citing *Phillips*, 415 F.3d at 1317).)

Gordini's assertion that a "passageway" must be "fully enclosed" is contrary to the plain meaning of "passageway," and Gordini does not present any evidence that "passageway" is understood differently to someone of skill in the art. Although the specification only refers to figures showing "passageways" that are in fact fully enclosed (*see* Pls.' Mem., Ex. A at col. 7, ll.

57–60, Fig. 17), "a court should not read a limitation from the specification into the claim." *See*

*Tate*, 185 F. Supp. 2d at 595. "Similarly, the mere fact that the patent drawings depict a

particular embodiment of the patent does not operate to limit the claims to that specific

configuration." *Anchor Wall Sys.*, 340 F.3d at 1306–07. Further, the '483 patent noted its relation

to the application for U.S. Patent No. 6,502,248 ("'248 patent") (Pls.' Mem., Ex. A at col. 1, ll.

10–12.), and the '248 patent includes an illustrative figure showing a passageway that is *not*

"fully enclosed" on all four sides. (*Id.*, Ex. H at col. 8, ll. 50, Fig. 14.) All of these points

highlight the fact that a passageway may be fully enclosed, but it need not be. If 180s intended to

for "passageway" to mean a "fully enclosed passageway," the claim should have read "fully

enclosed passageway" or "tunnel."

        iv.    <u>"Projection"</u>

     180s' proposed construction for "projection" is "something that extends outward," and

Gordini's is "a tooth-like extension protruding radially from a member surface."

     **I construe "projection" as "something that extends outward from a surface."** The

portion of this construction that reads "something that extends outward" is the widely accepted

understanding of "projection." The entire construction, including the phrase "from a surface," is

consistent with all the relevant language in the specification. (*See, e.g.*, *id.*, Ex. A at col. 7, ll. 47–

49, Figs. 16 & 17.) Furthermore, although this Court need not consult extrinsic evidence because

the intrinsic evidence is clear, *Phillips*, 415 F.3d at 1324, this construction closely tracks the

dictionary definition. (Pls.' Mem., Ex. D ("projection" is "a thing that extends outward from

something else").)

     Defining "projection" as, in part, "tooth-like" would be vague and imprecise. In fact, as

180s points out, the "projections" shown in the patent figures do not particularly resemble teeth.

Nor do claims 3 or 4 require that the "projections" protrude "radially" from the "member." Such a limitation simply does not exist in the claim language.

> v.    "Plurality of Projections"

180s urges the following construction of "plurality of projections": "two or more projections." Gordini argues for "a large number of tooth-like extensions protruding radially from a member surface."

**I construe "plurality of projections" as "two or more projections."** The plain and ordinary meaning of "plurality" is the "state of being plural," which is synonymous with two or more. *Dayco Prods., Inc. v. Total Containment, Inc.*, 258 F.3d 1317, 1325–28 (Fed. Cir. 2001) (citing *Yorks Prods. Inc. v. Cent. Tractor Farm & Family Ctr.*, 99 F.3d 1568, 1575 (Fed. Cir. 1996)); *see also Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. App'x 603, 606 (Fed. Cir 2007) (unpublished) (noting that "the well understood meaning of the term 'plurality' both in general and in patent parlance" is "two or more"). Gordini points out that the patent figures always show a "second frame member"—which the claim characterizes as having a "plurality of projections"—with a "large number" of "projections." However, consistent with the principle that limitations will not be read from the specification into the claim, the Federal Circuit has expressly held that "plurality" may still mean "two or more" where the relevant figures show more than two "projections."[9] *See Dayco Prods.*, 258 F.3d at 1327–28.

I am also not persuaded by Gordini's argument that "plurality" must mean a "large number" because the "second frame member" must have a "large number" of "projections" to

---

[9] Gordini erroneously argues that *Dayco Products* only stands for the proposition that "plurality" means "two or more" unless there is "some indication to the contrary." Although the *Dayco Products* court, in describing prior Federal Circuit decisions, stated "we have held that 'plurality,' when used in a claim, refers to two or more items, absent some indication to the contrary[,]" the court went on to hold that "plurality . . . of projections" means "two or more" *even* where the figures showing the patent's preferred embodiments included four projections. *Dayco Prods.*, 258 F.3d at 1327–28 (emphasis added).

establish adjustability. At oral arguments, 180s pointed out that adjustability could be created

merely by friction, without dotting the "second frame member" with a "large number" of

projections.[10] 180s also noted that nothing in the claim language actually requires that the ear

warmer be adjustable.[11]

B.

180s brought patent and trade dress infringement counts against Gordini based on the

'645 patent, which "describes ear warmers that organize headphone components in a manner that

protects speaker components and facilitates a wearer's ease of use of the electronic components."

(Pls.' Mem. at 1, 6.) These allegations implicate thirteen claims in the '645 patent: 1–4 and 7–15.

Independent claim 1 reads:

> **1.** An apparatus, comprising:
> a frame having an interior side and an exterior side, the frame being
>     configured to extend around the back of a user's head;
> a first membrane coupled to at least a portion of the interior side of the
>     frame;
> a second membrane coupled to one of the frame and the first membrane, the
>     first membrane and the second membrane defining a receptacle and an
>     opening that communicates with the receptacle, the opening being
>     disposed proximate the interior side of the frame;
> a speaker disposed in the receptacle; and
> a first electrical wire having a first end electrically coupled to the speaker
>     and a second end including a connector, the connector being disposed
>     proximate to the opening of the receptacle and configured to be
>     electrically coupled to a second electrical wire disposed outside of a
>     housing of the device associated with sound generation.

---

[10] Though not directly relevant to this term construction, the "second frame member" probably must have—despite claim language describing "a second frame member including a plurality of projections"—at least two "projections" on *each end*. Claim 3 describes "engaging the projection on the first frame member with the plurality of projections on the second frame member." For the "first frame member," which rests somewhere in the vicinity of one of the user's ears, to "engage with" a "plurality of projections," the "second frame member" would have to have at least two "projections" on the end that links up with the "first frame member." Similarly—because claim 4 also describes "wherein coupling the second frame member and the third frame member comprises: . . . engaging the projection on the third frame member with the plurality of projections on the second frame member"—the other side of the "second frame member" must also have at least two "projections." Accordingly, the claim language probably requires the "second frame member" to have at least *four* "projections."

[11] In its Opening Claim Construction Brief, Gordini seems to urge this Court to construe "insert." 180s argues this term should not be construed because Gordini did not previously identify this term. Because Gordini does not respond to 180s argument in its Response, and it is not particularly clear whether Gordini is in fact seeking such a construction, I did not construe "insert."

(*Id.*, Ex. B at col. 10, ll. 1–20.) 180s and Gordini disagree about which of these claims' terms I

should construe. 180s offers construction for the following six terms: "[first/second] membrane,"

"receptacle," "opening," "communicates with," "disposed proximate," and "second end

including a connector." Gordini presents constructions for two terms: "an opening that

communicates with the receptacle, the opening being disposed proximate the interior side of the

frame" and "second end including a connector."[12] (*See* Joint Claim Constr. Statement ("Joint

Constr.") at 2.) The first "term" for which Gordini urges a construction is unwieldy, lengthy, and

complex. Accordingly, I find it more practical to construe this claim language in smaller pieces

as urged by 180s.

      i.     <u>"[first/second] membrane"</u>

**As 180s and Gordini propose, I construe "membrane" as "a layer of fabric or**

**materials."** (*See* Pls.' Mem. at 19; Def. Response at 13.)

      ii.     <u>"receptacle"</u>

**As 180s and Gordini propose, I construe "receptacle" as "container."** (*See* Pls.'

Mem. at 21; Def. Response at 13.)

      iii.     <u>"opening"</u>

180s argues for construing "opening" as "open space serving as a passage or gap."

Considering its construction of "an opening that communicates with the receptacle, the opening

being disposed proximate the interior side of the frame," Gordini seems to urge construing

---

[12] Although Gordini asked me to construe the term "the connector being disposed proximate to the opening of the receptacle" in both its Opening Claim Construction Brief and its Response, it appears to abandon that approach and instead joins 180s in asking this Court to construe "second end including a connector." (*See* Joint Constr. at 2.)

"opening" as "a port that is positioned near and within the inside surface, i.e., the surface closest to the user's head when worn."[13] Gordini also seems to urge a further limit that the "opening" be "unimpeded."

**I construe "opening" as an "open space serving as a passage or gap."** This definition is consistent both with the embodiments in the specification and the widely accepted understanding of the term and. To be sure, the "opening" must be "disposed proximate" the "interior" side of the ear warmer frame. However, any required proximity to the "interior side" is not found within the term "opening," but rather within terms "disposed proximate" and "interior." *See infra* Section II.B.v (construction of "disposed proximate").

Further, Gordini's "unimpeded" limitation is unnecessary and imprecise. If Gordini believes, as 180s suggests, that "unimpeded" means "unblocked to provide continuous access by the user," such a limitation is simply not found in the claim language or specification. For example, an "opening" that is somewhat impeded by fabric, but nonetheless allows access to the "connector," would in fact, I believe, still be considered an "opening" under this claim language. (*See, e.g.*, Pls.' Mem., Ex. B. at col. 4, ll. 50–58 (specification describing an embodiment in which the "connector" is not stored within the "receptacle," but is protruding out of the "opening" such that the user need not have unimpeded access through the "opening" and into the "receptacle").)

---

[13] Matching Gordini's constructions with particular claim terms or language, especially for the '645 patent, is a difficult endeavor, in part because Gordini construed longer phrases and not individual words. For example, Gordini may actually be urging the Court to define "disposed proximate the interior side" when it urges the construction "near and within the inside surface, i.e., the surface closest to the user's head when worn." That said, the outcome of these claim constructions would remain the same regardless of where this opinion discusses each of Gordini's proposed constructions.

iv.    "communicates with"

180s urges this Court to define "communicates with" as "provides access to." In contrast,

Gordini seems to—again, based on its construction of "an opening that communicates with the

receptacle . . ."—urge two constructions: "[allows] for something such as a wire or jack to pass

through the port when the apparatus is worn by a user" and/or "[provides] continued, unimpeded

access by the wearer during use to allow the user to connect and disconnect a device such as an

iPod."

**I construe "communicates with" as "provides access to."** Again, "continued,

unimpeded access by the wearer" is imprecise and unnecessary. *See supra* Section II.B.iii. In

claim 1, "the opening . . . communicates with receptacle." That is, the "opening" must "provide

access to" "the receptacle." Whether that access is "impeded" or "continuous" is irrelevant and

extraneous.

A more difficult question is whether "communicates with" means "provides access to

[the receptacle] . . . for something such as a wire or jack to pass through the opening." First,

Gordini's argument that the doctrine of prosecutorial disclaimer is applicable here is

unpersuasive. This doctrine precludes a patentee from "recapturing through claim interpretation

specific meanings disclaimed during prosecution." *See Omega Eng'g*, 334 F.3d at 1323–26. To

trigger this rule, the disclaimer must be unambiguous. *Id.* Even if this the doctrine does not

apply, however, prosecution history is relevant intrinsic evidence for claim construction, though

less so than the claim language or specification. *See Phillips*, 415 F.3d at 1313–17. The Patent

Office initially rejected the '645 patent as anticipated by the Siskin headphones/ear warmer, U.S.

Patent No. 6,888,950 ("Siskin Patent"). In response, to distinguish it from the Siskin Patent, 180s

amended its claim to require that the opening be "disposed proximate the interior side of the

frame." (Def.'s Mem., Ex. 14 at 3; Rebuttal Claim Constr. Brief of Pls. 180s, Inc. and 180s, LLC ("Pls.' Response") at 15.) Although not entirely clear, Gordini seems to argue that 180s, in amending the '645 patent and responding to its initial rejection, accepted "provid[ing] access for something such as a wire or jack to pass through" as the meaning of "communicates with." More specifically, 180s allegedly distinguished the '645 patent from the Siskin Patent by noting that the Siskin Patent has "an opening (110), through which the control portion (108) of the electronic component is extended," whereas the corresponding "opening" in the '645 patent is on the "interior" side of the frame. Accordingly, Gordini argues "180s explicitly argued . . . that the purpose of the claimed opening is to allow for components of the apparatus to pass from the interior to the exterior so that they are accessible to a wearer during use." Although 180s may have unambiguously disclaimed any embodiment in which the "opening" was not on the interior of the ear warmer, 180s did not unambiguously disclaim any definition of "opening" that lacked a wire or jack passing through.

The claim language also supports the "provides access to" construction. To be sure, the claim language—"an opening that communicates with the receptacle"—is ambiguous, and 180s perhaps should have used the clearer phrase "provides access to." Additionally, "communicates with" is not a widely accepted synonym for "provides access to," but implicates the idea of facilitating communication (such as electrical communication). However, "communicates with" is also not synonymous with "provides access to for something such as a wire or jack to pass through." More importantly, as 180s stressed at the *Markman* hearing, the configuration of the ear warmer's electrical components are discussed in a different section of claim 1. Two paragraphs after "communicates with," claim 1 reads:

> [A] first electrical wire having a first end electrically coupled to the speaker and a second end including a connector, the connector being disposed proximate to the opening of the receptacle and configured to be electrically coupled to a

> second electrical wire disposed outside of a housing of the device associated
> with sound generation.

(Pl.'s Mem., Ex. B at col. 10, ll. 14–20.) Nothing suggests that the portion of claim 1 that

includes "communicates with" was intended to provide guidance regarding the electrical

configuration of the patent. If Gordini wants to limit the '645 patent to a certain electrical

configuration, it must find such a limitation in the claim language that pertains to the electrical

configuration. Lastly, there is extrinsic support for the "provides access to" construction. One

dictionary definition—though the third and last listed—of "communicate" is "to open into each

other; connect." *See* MERRIAM-WEBSTER ONLINE DICTIONARY, http://www.merriam-

webster.com/dictionary/communicate.

v.   <u>"disposed proximate"</u>

180s urges the following construction of "disposed proximate": "located closely in space

[to]." Gordini argues for a different construction: "being positioned near and within" "so as to be

accessible from."[14]

**I adopt 180s' proposed construction: "located closely in space [to]."** This construction

is the closest to the plain and ordinary meaning of the term. If the claims intended a "near and

within" meaning, they should have used that language. "Proximate" is widely understood as

meaning "close to" or "near," but not necessarily "within." Furthermore, this construction makes

sense in light of the specification and fits both uses of "disposed proximate" in claim 1: "the

connector" is "located closely in space" to "the opening" *and* "the opening" is "located closely in

space" to "the interior side." Finally, the dictionary supports this construction. The most relevant

definition of "dispose" is "to put in place: set in readiness: arrange"; the most relevant definition

---

[14] Gordini's Opening Claim Construction Brief and the Joint Claim Construction Statement suggest Gordini's construction for "disposed proximate" is "being positioned near or within." (*See* Def.'s Mem. at 31; Joint Constr. at 2.) However, in its Response, Gordini also argues that "[t]he '645 opening must be 'disposed,' i.e., 'set in readiness,' see Merriam-Webster online, so as to be accessible from the interior of the ear warmer frame." (Def.'s Response at 16.) Furthermore, Gordini vacillates between "near *or* within" and "near *and* within."

of "proximate" is "very near: close." MERRIAM-WEBSTER ONLINE DICTIONARY,

http://www.merriam-webster.com/dictionary/proximate; MERRIAM-WEBSTER ONLINE

DICTIONARY, http://www.merriam-webster.com/dictionary/disposed.

> vi.   "second end including a connector"

180s urges construing "second end including a connector" as "an end having or coupled

to a connector." Gordini urges construing the term as a "second extremity forming one piece of a

jack for establishing an electrical communications connection."

**I adopt the following construction of "second end including a connector": "a second**

**end having or coupled to something that establishes an electrical communications**

**connection."** 180s' construction of "second end including" as an "end having or coupled to" is

consistent with the plain meaning of the phrase and the specification. However, 180s

construction is incomplete; this term construction must clarify that the "connector" is an

"electrical communications connection." The plain meaning of "connector" does not necessarily

implicate electrical communication, so an ordinary fact finder would be easily misled into

believing the "connector" lacks such a meaning. Yet the specification is unambiguous that

"connector" in fact facilitates an "electrical communication connection," and 180s does not point

to any claim language or specification language disclaiming such an understanding.

Consequently, although "jack" may inappropriately limit the term "connector," defining

"connector" as "something that establishes an electrical communications connection" is

consistent with the specification. (*See, e.g.*, Pls.' Mem., Ex. B. at col. 4, l. 59 – col. 5, l. 8 ("The

connector 450 can be either a male or female connector and is configured to be coupled to

another wire as illustrated, for example, by the wire W in FIG. 2. Note that connector 450 is

illustrated as a female connector in FIG. 2 and as a male connector in FIG. 9.").)

C.

Lastly, 180s brings a design patent infringement claim against Gordini based on the '001 design patent. The only claim in '001 reads: "The ornamental design for an ear warming having an external frame, as shown and described." (*Id.*, Ex. C.) The claim specification simply refers to seven illustrative figures, two of which are pictured below:



(*Id.*, Ex. C.) Because both parties agree that most of the "broken lines" form no part of this design, this claim covers only the "small, left-side portion" of the ear warmer that is shown in solid lines.

180s cites *Egyptian Goddess, Inc. v. Swisa, Inc.*, 543 F.3d 665, 670 (Fed. Cir. 2008) to oppose a verbal construction of this claim. 180s argues that the claim is best represented by simply the seven figures set forth in the patent.

Gordini, on the other hand, asks for the following verbal construction:

> A small left side portion, having the shape and proportions shown, in an external ear warmer frame, that tapers, when viewed from the side, between a forward end and a rear end; jagged forward and rear edges; and top and bottom arcuate edges; wherein the small left-side portion is substantially asymmetrical around a horizontal axis of rotation, extending between the forward edge and the rear edge.

Gordini also requests that I decide whether:

(1) "the '001 design patent claim is limited to the small portion shown in solid lines, including the jagged solid lines at the left and right ends and the broken fold line, the other broken lines being disclaimed";

(2) "there are any ornamental (rather than functional) features in the small claimed portion that joins the headband member and the left ear frame member"; and

(3) "[a]fter subtracting unprotectable functional features, what if any ornamental features in the claimed design portion are present: (a) in the prior art and (b) in the accused Gordini earmuff."

Although it does not offer a verbal alternative, as it believes none is necessary, 180s asserts that Gordini's proposed verbal construction is flawed because the claimed design is not intended to necessarily have "jagged edges"—but rather they merely "illustrate an arbitrary boundary between the claimed portion and the disclaimed portions"—and the construction "is entirely inconsistent with the priority claim."

### i.  Legal Principles Specific to Design Patent Claim Construction

A design patent may be obtained for "any new, original and ornamental design for an article of manufacture." *See, e.g.*, *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 103 (Fed. Cir. 1996) (quoting 35 U.S.C. § 171). A design patent (1) must be non-obvious and (2) protects only "ornamental"—that is, non-functional—features of the design. *See, e.g.*, *OddzOn Prods. Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1404–05 (Fed. Cir. 1997); *Durling*, 101 F.3d at 103 (citing 35 U.S.C. § 103).

"[C]ourts have traditionally undertaken a familiar two-step approach" in addressing design patent infringement: first, claim construction and, second, comparing the accused article to the construed claim. *OddzOn Prods.*, 122 F.3d at 1405. Recently, the Federal Circuit, in *Egyptian Goddess*, clarified that step two hinges on "identity of appearance" to an ordinary person, not "to the eye of an expert." *Egyptian Goddess*, 543 F.3d at 670 (quoting *Gorham v. White*, 81 U.S. 511, 527 (1871)) (if infringement hinged on the eye of an expert, "there never could be piracy of a patented design, for human ingenuity has never yet produced a design, in all

its details, exactly like another, so like, that an expert could not distinguish them"). More specifically, the test for step two is whether an ordinary observer, familiar with the prior art, would find the accused design "substantially similar" to the patented design.[15] *Id.* at 677–78; *see also Wing Shing Prods. (BVI) Co. Ltd. v. Sunbeam Prods., Inc.*, 665 F. Supp. 2d 357, 361 (S.D.N.Y. 2009).

*Egyptian Goddess* also clarified a distinction between design patent claim construction (step one) and other patent claim construction. Although the district court *may* verbally construe a design patent claim, "[g]iven the recognized difficulties entailed in trying to describe a design in words, the preferable course ordinarily will be for a district court not to attempt to 'construe' a design patent claim by providing a detailed verbal description of the claimed design."[16] *Egyptian Goddess*, 543 F.3d at 679 (emphasis added); *accord Crocs, Inc. v. Int'l Trade Comm'n*, --- F.3d ---, 2010 WL 638272, at *5 (Fed. Cir. Feb. 24, 2010) ("[A]s a rule, the illustration in the drawing views is its own best description." (quoting MANUAL OF PATENT EXAMINING PROCEDURE § 1503.01 (8th ed. 2006))). Verbally construing a design patent claim risks unduly emphasizing "particular features of the design" and focusing on "each individually described feature in the

---

[15] Although this is how this test is usually described, prior art is not actually always relevant. Rather, *Egyptian Goddess* created "two levels" to step two: "a level-one or 'threshold' analysis to determine if comparison to the prior art is even necessary, and a second level analysis that accounts for prior art in less obvious cases." *Wing Shing Prods.*, 665 F. Supp. 2d at 362.

[16] Gordini argues that the Federal Circuit "require[s] detailed verbal descriptions in cases of obviousness, see *Durling v. Spectrum Furniture Co.*, 101 F.3d 100, 102 (Fed. Cir. 1996), cited with approval in *Egyptian Goddess* at 679 n. 1 [sic], and in cases of functionality, see *Oddzon Prods., Inc. v. Just Toys, Inc.*, 122 F.3d 1396, 1405 (Fed. Cir. 1997), also cited with approval in *Egyptian Goddess* at 680 [sic]. Here, functionality and obviousness are key issues, thus, a detailed verbal description of the '001 claimed design portion is required . . . ."

I disagree. First, immediately after citing *Durling* "with approval," the *Egyptian Goddess* court distinguished the rule announced in *Durling*—which pertained to describing a design patent in explaining a decision that the patent was invalid as obvious—from a rule requiring a verbal description at the claim construction stage: "Requiring such an explanation of a legal ruling as to invalidity is quite different from requiring an elaborate verbal claim construction to guide the finder of fact in conducting the infringement inquiry." *Egyptian Goddess*, 543 F.3d at 679 n.1.

Second, in citing *OddzOn Products*, the *Egyptian Goddess* court was merely re-affirming that district courts should "distinguish [for the fact-finder] between those features of the claimed design that are ornamental and those that are functional." *Id.* at 680. *Egyptian Goddess* never suggested that a detailed verbal claim construction would be required "in cases of functionality."

verbal description rather than on the design as a whole." *Egyptian Goddess*, 543 F.3d at 679–80; *accord Crocs*, 2010 WL 638272, at *5. That said, the district court has significant discretion about whether to verbally construe a claim and what level of detail to include in such a construction. *Egyptian Goddess*, 543 F.3d at 679.

As part of design patent claim construction, in addition to verbally describing the claim, "a trial court can usefully guide the finder of fact by addressing a number of other issues that bear on the scope of the claim." For example, the court may:

> (1) "describ[e] the role of particular conventions in design patent drafting, such as the role of broken lines"
> (2) "assess[] and describ[e] the effect of any representations that may have been made in the course of the prosecution history"
> (3) "distinguish[] between those features of the claimed design that are ornamental and those that are purely functional"

*Id.* at 680 (internal citations omitted).[17]

---

[17] *Egyptian Goddess* was unclear regarding whether these three functions were to be performed at claim construction or at a later stage in the litigation:

> Apart from attempting to provide a verbal description of the design, a trial court can usefully guide the finder of fact by addressing a number of other issues that bear on the scope of the claim. Those include such matters as describing the role of particular conventions in design patent drafting, such as the role of broken lines, *see* 37 C.F.R. § 1.152; assessing and describing the effect of any representations that may have been made in the course of the prosecution history, *see Goodyear Tire & Rubber Co.*, 162 F.3d at 1116; and distinguishing between those features of the claimed design that are ornamental and those that are purely functional . . .

*Egyptian Goddess*, 543 F.3d at 680. Because this section starts with "apart from attempting to provide a verbal description" and includes "guide the fact finder," at least one court held that *Egyptian Goddess* cautions against addressing these issues at claim construction in advance of trial or in advance of summary judgment motions. *See DePaoli v. Daisy Mfg. Co.*, 2009 WL 2145721, *3–*5 (D. Mass. July 14, 2009). Just a few weeks ago, however, the Federal Circuit implicitly clarified that "apart from attempting to provide a verbal description" did not necessarily mean "separate from claim construction." *See Richardson v. Stanley Works, Inc.*, ---F.3d---, 2010 WL 774334, *2–*3 (Fed. Cir. March 9, 2010) (citing to *Egyptian Goddess* and affirming the district court's decision to, after a bench trial, distinguish the design patent's ornamental and functional aspects as part of claim construction). However, *Richardson* does not expressly demand that the district court distinguish the ornamental and functional characteristics at the claim construction stage as opposed to some later stage in the litigation. Rather, *Richardson* merely clarifies that, post-*Egyptian Goddess*, a district court should still distinguish between ornamental and functional characteristics at some point in design patent infringement cases, and that the court is permitted to engage in that inquiry as part of claim construction (at least when claim construction occurs after a bench trial).

ii.   ‘001 Design Patent Claim Construction

**I construe the '001 design patent claim as simply the seven figures included in the patent.** A verbal construction is unnecessary as these illustrative figures speak for themselves. Gordini's proposed construction demonstrates why the Federal Circuit advises against detailed verbal constructions: it confuses and causes more harm than good. For example, "top and bottom arcuate edges" and "substantially asymmetrical around a horizontal axis of rotation" are less clear than the illustrations alone. Disputes about the visual characteristics of the design—such as what exactly the "jagged lines" depict—may be properly resolved by this Court at a later stage in the litigation or by the fact finder at trial.

**Although it is debatable whether this is the most appropriate stage for this determination,[18] I also hold that the claim is demarcated only by the solid lines in the figures.** Gordini's argument that the broken line in the middle of the claimed portion should be considered a "middle arcuate folding edge" is unpersuasive. Although 180s agrees that in some circumstances broken lines represent "fold lines" and are thus a part of the claim, Gordini offers no persuasive reason why this particular broken line should be viewed as a "fold line." Rather, 180s' explanation—that this broken line shows where two parts of the ear warmer abut—is more plausible.

**Finally, I will refrain from distinguishing the claim's ornamental and functional characteristics at this time.[19]** Although a district court may distinguish between these features at the claim construction stage, I believe I also have discretion to wait until a later stage of the litigation to make that decision, as long as I do so before proceeding to the step 2 comparison of

---

[18] For the reasons explained in *supra* note 17, it is within my discretion to make this determination now.

[19] This inquiry serves two primary purposes: (1) determining if the claim is invalid because it is "primarily functional" and (2) even if the claim is valid, determining which characteristics of the claim will not be protected because they are functional (and not ornamental). *See Richardson*, 2010 WL 774334, at *2; *OddzOn Prods.*, 122 F.3d at 1404–06.

the claim and the accused article. *Cf. Richardson*, 2010 WL 774334, at *1–*3 (affirming the district court distinguishing ornamental and functional features as part of claim construction at the conclusion of a bench trial); *Egyptian Goddess*, 543 F.3d at 679–80 (noting that a district court has significant discretion in deciding how to proceed with design patent claim construction); *OddzOn Prods.*, 122 F.3d at 1399–1406 (affirming the district court distinguishing ornamental and functional characteristics as part of claim construction after cross-motions for summary judgment,); *DePaoli*, 2009 WL 2145721, at *8 ("It is not entirely apparent from this passage whether the Federal Circuit advocates resolving . . . functionality issues through formal Markman claim construction, jury instructions, or some other means. . . . One thing that does seem clear from *Egyptian Goddess* is that district courts have considerable discretion for resolving this type of question."). *But cf. Mag Instruments, Inc. v. JS Prods., Inc.*, 595 F. Supp. 2d 1102, 1107–08 (C.D. Cal. 2008) ("Assuming . . . that Plaintiff's Patents contain both functional and non-functional elements, the Court, in the usual course of issuing a claim construction order, will construe the challenged claims to identify the non-functional aspects of the design as shown in the patent.").

In this case, it is prudent to defer distinguishing the ornamental and functional features until a later stage in the litigation. Unlike *OddzOn Products* and *Richardson*, this case is not on the verge of proceeding to the comparison of the accused article and the claim. On the contrary, it would be premature to compare Gordini's ear warmer to the '001 design patent claim because discovery is not complete and the parties have not fully briefed these issues. There is therefore no rush to distinguish the claim's ornamental and functional features, and Gordini does not

provide any other convincing rationale for not waiting until the close of discovery to resolve these functionality questions.[20]

DATE: March 30, 2010

_____/s/_____
J. Frederick Motz
United States District Judge

---

[20] Because I also believe it is inappropriate for resolution at this stage, I do not address Gordini's request that this Court decide whether "[a]fter subtracting unprotectable functional features, what if any ornamental features in the claimed design portion are present: (a) in the prior art and (b) in the accused Gordini earmuff." *Cf., e.g., OddzOn Prods.*, 122 F.3d at 1405–06 (in design patent infringement analysis, distinguishing between (1) "construing the claim to the design" and (2) "comparing [the construction] to the design of the accused device"); *Wing Shing Prods.*, 665 F. Supp. 2d at 362–68 (addressing whether the accused device infringed on the design patent—by analyzing the differences between the accused device and the design patent both considering and not considering the prior art—at the summary judgment stage).